1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9    craigslist, Inc., a Delaware corporation,

10          Plaintiff,

11    v.

12    Naturemarket, Inc. d/b/a powerpostings.com,
      Igor Gasov,

13          Defendants.

14    _____/

No. C 08-05065 PJH (MEJ)

**REPORT AND RECOMMENDATION
RE: PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT**

## I.  INTRODUCTION

Pending before the Court is Plaintiff craigslist's Motion for Default Judgment against Defendants Igor Gasov and Naturemarket, Inc. d/b/a powerpostings.com.  (Dkt. #43.)  To date, Defendants have not filed an opposition or otherwise appeared in this matter.  On July 2, 2009, the Honorable Phyllis J. Hamilton, the presiding judge in this matter, referred the pending Motion to the undersigned to prepare a Report and Recommendation.  (Dkt. #47.)  After thoroughly reviewing Plaintiff's briefs, pleadings, and the controlling legal authorities, the undersigned **RECOMMENDS** that the District Court **GRANT** Plaintiff's Motion for Default Judgment against Defendants as set forth below.

## II.  BACKGROUND

**A.      Factual Background**

Plaintiff initiated this action by filing a Complaint against Defendant Naturemarket, Inc.d/b/a powerpostings.com.  (Dkt. #1.)  On March 31, 2009, Plaintiff filed its First Amended Complaint

1    adding Defendant Igor Gasov as a named defendant.  (Dkt. #23.)  The following facts are taken from

2    Plaintiff's Complaint and First Amended Complaint.

3        Plaintiff is a Delaware corporation, with its principal place of business in San Francisco,

4    California.  (Compl. ¶19; FAC ¶19.)  Plaintiff owns and operates the website www.craigslist.org,

5    which is an internet-based local classified ad service.  (Compl. ¶2; FAC ¶2.)  Plaintiff has registered

6    copyrights in the website, including the website's account creation and ad posting pages.  (Compl.

7    ¶¶62-69; FAC ¶¶63-70.)  Plaintiff has also registered the "craigslist" mark.  (Compl. ¶¶70-77; FAC

8    ¶¶71-78.)

9        Access to and use of Plaintiff's website and services are governed by its Terms of Use

10   Agreement ("TOUs").  (Compl. ¶¶10, 11, 32-36; FAC ¶¶10, 11, 33-37.)  The TOUs are posted on

11   the website, and craigslist users cannot post ads or create accounts on the craigslist website without

12   first agreeing to the TOUs.  (Compl. ¶¶32-36; FAC ¶¶33-37.)  The TOUs protect craigslist users

13   and, according to Plaintiff, preserve the simplicity, ease of use, and fairness that are foundations of

14   its website and services.  (FAC ¶¶9-10.)

15       Plaintiff's TOU grants users a limited license to access and use Plaintiff's website subject to

16   certain restrictions.  (Compl. ¶33; FAC ¶34.)  In particular, the TOU expressly prohibit users from

17   engaging in repeated postings of similar content, posting ads on behalf of others, gaining

18   unauthorized access to Plaintiff's computer systems, and using automated posting devices or

19   computer programs that enable the submission of postings on craigslist.com without each posting

20   being manually entered by the author thereof, including the use of any such automated posting

21   device to submit postings in bulk for automatic submission of postings at regular intervals.  (Compl.

22   ¶35, Ex. A ¶¶7(y), 8; FAC ¶36 & Ex. A ¶¶7(y), 8.)

23       In an effort to prevent users from using automated posting devices, Plaintiff employs a

24   number of security measures to protect its website.  (Compl. ¶¶49-61; FAC ¶¶50-62.)  These

25   measures include providing users with temporary email addresses, telephone verification for ads,

26   and use of "Completely Automated Public Turing test to tell Computers and Humans Apart"

27   ("CAPTCHA") software, which is capable of determining whether an ad is being posted by a

28   computer or a human.  (*Id.*)  Plaintiff employs CAPTCHAs to ensure that user accounts and user ads

are created and posted manually (as required by the TOUs) and not by automated means.  (Compl. ¶¶53, 54; FAC ¶¶54, 55.)  CAPTCHAs therefore prevent automatic posters from using, accessing, and copying copyright-protected portions of Plaintiff's website, including its post to classifieds and account registration features, and protect Plaintiff's intellectual property rights.  (Compl. ¶¶54-56, 69; FAC ¶¶55-57, 70.)

Plaintiff also employs telephone verification in certain categories of ads to prevent automated, repetitious, unauthorized, unlawful, and abusive postings.  (Compl. ¶¶57-58; FAC ¶¶58-59.)  Telephone verification also prevents posters from using, accessing, and copying copyright-protected portions of the craigslist website, including its post to classifieds and account registration features, thereby protecting Plaintiff's intellectual property rights.  (Compl. ¶¶59-60, 69; FAC ¶¶60-61, 70.)

Defendants Naturemarket, Inc. and Igor Gasov operate the website www.powerpostings.com.  (Compl. ¶85; FAC ¶ 86.)  Through this website, Defendants developed, advertised, and sold software to automate posting ads on craigslist.com, services to post ads for customers, programs to gather craigslist user email addresses from the craigslist website, and systems to circumvent Plaintiff's security measures.  (*Id.*)  Defendants used their website to sell products including "CraigsList AutoPoster Professional," "Craigslist Top Secret Pro," "Craigslist Add [sic] Confirmer and Flagger," and phone-verified craigslist accounts.  (Compl. ¶¶85, 88, 89, 90; FAC ¶¶ 86, 89, 90, 91.)  Defendants advertised and explained on their website that their CraigsList AutoPoster Professional software allows customers to "automate [their] personal and business advertising," and "makes the difficult Craigslist posting process child's play and helps you manage and multi-post your ads."  (Compl. ¶86; FAC ¶87, Dkt. #44, "Declaration of David Weeks" ¶3(b), Ex. 2.)  Thus, Defendants' CraigsList AutoPoster Professional allows users to post ads automatically to the craigslist website in whatever quantity, frequency, and location the user wishes, in direct violation of the TOUs.  Defendants charged customers $84.95 for their CraigsList AutoPoster Professional program.  (Compl. ¶87; FAC ¶88.)

Defendants also advertised and sold "Posting Agent" services as defined by Plaintiff's TOUs. (Compl. ¶¶93-95; FAC ¶¶94-96; Weeks Decl. ¶3(c), Ex. 3.)[1] Through this service, Defendants posted ads on Plaintiff's website for its customers and advertised and sold these services in packages of $50 for five posts per day for one week, $125 for fifteen posts per day for one week, and $175 for twenty-five posts per day for one week. (Compl. ¶95, FAC ¶96; Weeks Decl. ¶3(c), Ex. 3.)

Defendants also developed, advertised, and sold software that impermissibly gathered email addresses of users from the craigslist website to later use to spam those users. (Compl. ¶88; FAC ¶89.) According to Defendants' advertisement, "Craigslist Top Secret Pro" pulls "[t]he 'Real' emails of Auto poster [and] manual posters." (Compl. ¶88, FAC ¶89.) The software allows spammers to "[g]rab [*r]esponsive* [l]ists from 8 [c]ategories and 99 subcategories of posters." (Weeks Decl. ¶3(d), Ex. 4.) Defendants claimed that the software provided customers with the email addresses of "thousands of fresh posters daily from Craigslist." (Weeks Decl. ¶3(d), Ex. 4.) Defendants also developed, advertised, and sold "Craigslist Add [sic] Confirmer and Flagger" software, which allowed users to remove the ads of other craigslist users. (Compl. ¶89; FAC ¶90.)

In the course of developing, testing, updating, and using their products and services, Defendants consented to be governed by Plaintiff's TOUs. (Compl. ¶¶32-36, 98-102; FAC ¶¶ 33-37, 99-103.) Further, in the course of developing, testing, updating, and using their products and services, Defendants accessed and used Plaintiff's website for purposes unauthorized by and contrary to the TOUs. (Compl. ¶¶32-36, 80, 85-104; FAC ¶¶33-37, 81, 86-105.) Defendants were aware of the specific terms of the TOUs, intended to violate the TOUs, and concealed their intent to violate the TOUs each time they affirmatively accepted and agreed to abide by them. (Compl. ¶101; FAC ¶ 102.) Defendants also created copies of Plaintiff's copyrighted website in violation of the

---

[1]Defendants advertised their "Craigslist Posting Service" as follows:
> Trying to promote your business? Looking to market on Craigslist? We offer you a professional and reliable craigslist advertisement posting service. Posting can be frustrating and if you don't know how to do it, it can consume your valuable time. Let us help you post so you can focus on running your business. It doesn't cost a lot to reach millions of people. We can post your ad every day in any city.

(FAC ¶95; Weeks Decl. ¶3(c), Ex. 3.)

TOUs and Plaintiff's limited license by developing, testing, maintaining, and selling software and services based on these illegal copies. (Compl. ¶96-104; FAC ¶¶97-105.)

Defendants also developed, advertised, and sold products and services that enable users to circumvent Plaintiff's technological security measures and to access parts of the copyright-protected craigslist website without authorization. (Compl. ¶¶49-61, 85-104, 133-142; FAC ¶¶50-62, 86-105, 134-43.) Particularly, Defendants "CraigsList AutoPoster Professional" includes an automatic CAPTCHA bypass feature that allows Defendants and its customers to circumvent Plaintiff's CAPTCHA security measure. (Compl. ¶86; FAC ¶87.)

Defendants also sold "Phone Verified Craigslist Accounts." (Compl. ¶90; FAC ¶91.) Specifically, Defendants advertised and sold craigslist accounts that were all phone-verified, created with a unique phone number and IP address, and ready to use. (Compl. ¶91; FAC ¶92.) Defendants' phone-verified accounts allowed Defendants and their customers to circumvent Plaintiff's security measures and access and copy copyright-protected parts of Plaintiff's website without authorization. (Compl. ¶¶85, 97, 98; FAC ¶¶86, 98, 99.)

Plaintiff also charges that Defendants used the craigslist mark in commerce without authorization to advertise their unlawful software and services on the internet in a manner likely to confuse consumers as to their association, affiliation, endorsement, or sponsorship with or by Plaintiff. (Compl. ¶¶105-111; FAC ¶¶106-112.) Specifically, Plaintiffs allege that Defendants used the mark in paid sponsored link advertisements on internet search engines, including the Google search engine. (Compl. ¶¶106-07; FAC ¶¶107-08; Weeks Decl. ¶3(g), Ex. 7.)

Plaintiff alleges that Defendants developed, tested, maintained, and sold their software and services, and visited Plaintiff's website for over two years. (Weeks Decl. ¶3(b), Ex.2.) According to Plaintiff, each time Defendants visited Plaintiff's website to test their infringing software, Defendants violated Plaintiff's TOUs and its legal rights. (Compl. ¶97; FAC ¶98.)

Plaintiff alleges Defendants' actions caused severe and irreparable harm to its reputation and goodwill in the online community and with its users. (Compl. ¶¶116-17; FAC ¶¶ 117-18.) Plaintiff asserts that its website is founded on the fairness and simplicity of its operation and that Defendants' auto-posing and circumvention systems enable its customers to unfairly compete against and

frustrate legitimate users in craigslist marketplaces. (Compl. ¶¶5, 9, 81, 82, 117; FAC ¶¶ 5, 9, 82, 83, 118, Weeks Decl. ¶3(h), Ex. 8.) Furthermore, Plaintiff alleges it has spent a considerable amount of time and money in an effort to thwart Defendants' effort to circumvent its online security measures and to prevent their continued unauthorized access to their computer systems and data. (Compl. ¶113; FAC ¶ 114.) Plaintiff alleges that at all times Defendants' actions were knowing, willful, malicious, and fraudulent. (Compl. ¶102; FAC ¶103.)

**B.      Procedural Background**

On November 5, 2008, Plaintiff filed its original Complaint against Defendant Naturemarket, Inc. d/b/a powerpostings.com, asserting claims for: (1) Copyright Infringement; (2) violation of the Digital Millennium Copyright Act ("DMCA"); (3) violation of the Computer Fraud and Abuse Act ("CFAA"); (4) violation of California Penal Code § 502; (5) trademark infringement under federal law; (6) California common law trademark infringement; (7) breach of contract; (8) inducing breach of contract; (9) intentional interference with contractual relations; and (10) fraud. (Dkt. #1.) Plaintiff served the Summons and Complaint on Defendant Naturemarket, Inc. on February 27, 2009. (Dkt. #16.) On March 30, 2009, the Clerk of the Court entered default against Defendant Naturemarket, Inc., but declined to enter default against Igor Gasov. (Dkts. #21-22.)

Subsequently, Plaintiff filed its First Amended Complaint asserting the same claims and naming Igor Gasov as an individual defendant. (Dkt. #23.) Plaintiff served the Summons and First Amended Complaint on Defendant Gasov on April 2, 2009. (Dkt. #25.) On June 5, 2009, Plaintiff requested entry of default against Defendant Gasov. (Dkt. #36.) Thereafter, on June 12, 2009, the Clerk entered default against Defendant Gasov. (Dkt. #40.)

On June 30, 2009, Plaintiff filed the instant Motion for Default Judgment against Defendants. (Dkt. #43.) On July 2, 2009, Judge Hamilton referred this case to the undersigned for a Report and Recommendation. (Dkt. #47.)

On August 13, 2009, the Court conducted a hearing on the matter. (Dkt. #50.) Defendants did not appear at the hearing. Based on Plaintiff's moving papers and oral arguments, the undersigned now recommends as follows.

**III. DISCUSSION**

**A.     Legal Standard**

Federal Rule of Civil Procedure 55(b)(2) permits a court, following default by a defendant, to enter default judgment in a case. "The district court's decision whether to enter default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  To assist courts in determining whether default judgment in appropriate, the Ninth Circuit has enumerated the following factors for the court to consider: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of dispute concerning material facts; (6) whether default was due to excusable neglect and; (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

Upon entry of default, all factual allegations within the complaint are accepted as true, except those allegations relating to the amount of damages. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  Where a default judgment is granted, the scope of relief is limited by Federal Rule of Civil Procedure 54(c): "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

**B.     Jurisdiction**

When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has the affirmative duty to look into its jurisdiction over the subject matter and the parties. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

1.     <u>Subject Matter Jurisdiction</u>

District courts have original jurisdiction to hear civil cases arising under the Constitution, laws or treaties of the United States. 28 U.S.C. § 1331.  As indicated above, Plaintiff has asserted four claims arising under federal law, including claims for copyright infringement, violation of the DMCA, violation of the CFAA, and trademark infringement.  Accordingly, the Court may properly exercise jurisdiction over this matter pursuant to § 1331.  Furthermore, because Plaintiff's state law claims "are so related to [the] claims" within the Court's original jurisdiction, the Court may also

1    properly exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §

2    1367(a).

3        2.    Personal Jurisdiction

4        Next, the Court must assess whether Defendants are subject to personal jurisdiction in this

5    Court.  As the party seeking to invoke this Court's jurisdiction, Plaintiff bears the burden of

6    establishing that this Court has personal jurisdiction over Defendants.  *See Scott v. Breeland*, 792

7    F.2d 925, 927 (9th Cir. 1986) (citing *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th

8    Cir. 1977)).  In the context of a motion for default judgment, the Court may dismiss an action *sua*

9    *sponte* for lack of personal jurisdiction.  *See In re Tuli*, 172 F.3d at 712.  Where there are questions

10   about the existence of personal jurisdiction, however, a court should allow the plaintiff the

11   opportunity to establish that jurisdiction is proper.  *Id*. at 713.

12       Plaintiff proffers two bases for personal jurisdiction over Defendants.  (*See* Dkt. #49 at 10-

13   11.)  First, Plaintiff argues that Defendants consented to jurisdiction when they agreed to its TOUs,

14   which contain a forum selection clause.  Second, Plaintiff contends that Defendants have sufficient

15   minimum contacts to support exercise of specific personal jurisdiction over them in this matter.  The

16   undersigned will evaluate each argument in turn.

17           a.    Consent

18       Plaintiff first argues that personal jurisdiction exists over Defendants based on the forum

19   selection clause in its TOUs.  (Dkt. #49 at 10.)  Specifically, paragraph 18 of the TOUs provides:

20   "You and Craigslist agree to submit to the personal and exclusive jurisdiction of the courts located

21   within the county of San Francisco, California."  (FAC, Ex. A, ¶18.)  Plaintiff contends that by

22   accepting the TOUs when accessing the craigslist website, Defendants assented to personal

23   jurisdiction in California, particularly in any court in San Francisco.  Because the claims raised in

24   this action arise from Defendants' abuses of the craigslist website, including violation of the TOUs,

25   Plaintiff argues that the Court may properly exercise jurisdiction over Defendants pursuant to the

26   forum selection clause in the TOUs.

27       Forum selection clauses, such as paragraph 18 in the TOUs, are presumptively valid.  *M/S*

28   *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972).  The Ninth Circuit has recognized that

accepting a forum selection clause evidences consent to personal jurisdiction in that forum. *See SEC v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007). Here, Plaintiff has established that, in order to access its website, Defendants had to agree to the TOUs, which included the forum selection clause stating that the user would be subject to personal jurisdiction in any court located in San Francisco. Thus, the undersigned agrees with Plaintiff that Defendants consented to jurisdiction in this Court when they agreed to the TOUs as a condition to accessing Plaintiff's website. The Court should therefore enforce the forum selection clause unless it is unreasonable. *See Zenger-Miller, Inc. v. Training Team, GMBH*, 757 F. Supp.1062, 1069 (N.D. Cal. 1991). The party disputing the validity of a forum selection clause bears the burden of proving the clause is unenforceable. *Id.* Defendants have not appeared in the case and thus have not raised any challenges to the clause, nor does the undersigned see any basis to find that it is unreasonable or unfair to enforce its terms. Accordingly, the undersigned finds that the Court may properly exercise personal jurisdiction over Defendants based on their consent to the forum selection clause in the TOUs.

> b.    *Specific Jurisdiction*

Alternatively, Plaintiff contends that the Court may properly exercise specific personal jurisdiction over Defendants. Personal jurisdiction over an out-of-state defendant is appropriate if the relevant state's long arm-statute permits the assertion of jurisdiction without violating federal due process. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004). Because California's long arm statute is co-extensive with federal due process requirements, the jurisdictional analyses under California law and federal due process are the same. *See id.* at 801. Therefore, absent traditional bases for personal jurisdiction (*i.e.*, physical presence, domicile, and consent), the Due Process Clause requires that nonresident defendants have certain "minimum contacts" with the forum state, "such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The Ninth Circuit has articulated a three-prong test to determine whether a party has sufficient minimum contacts to be susceptible to specific personal jurisdiction: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction in the forum or

resident thereof, or perform some act by which he purposefully avails himself of the privilege of

conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the

claim must be one which arises out of or relates to the defendant's forum-related activities; and (3)

the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be

reasonable. *Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.

1987)).

Here, all three prongs are satisfied. First, Plaintiff has shown that Defendants purposefully

directed their activity at California. Plaintiff has demonstrated that Defendants maintained a

commercial website that was interactive and open to commerce with California residents. *See IO*

*Group, Inc. v. Pivotal, Inc.*, No. C 03-5286 MHP, 2004 WL 838164, at *2 (N.D. Cal. April 19,

2004). Defendants also knowingly and intentionally accessed and used Plaintiff's website and

developed, marketed, and sold their software and services for the sole purpose of enabling users to

bypass the security measures of Plaintiff's website, in violation of its TOUs. Because Plaintiff is

headquartered in California and maintains its website in California, Defendants' actions directly

targeted California, and Defendants knew that Plaintiff would suffer the brunt of its harm in

California. Taking these facts into consideration, the undersigned finds that Plaintiff has sufficiently

shown that Defendants purposefully directed their conduct at California. *See Yahoo! Inc. v. La*

*Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

Under the second prong, for specific personal jurisdiction to exist, a plaintiff's claims must

arise "out of the defendant's forum-related activities." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d

1316, 1322 (9th Cir. 1998). In order to satisfy the requirement, the plaintiff must show that "but

for" the defendant's forum-related conduct, the injury would not have occurred. *Myers v. Bennett*

*Law Offices*, 238 F.3d 1068, 1075 (9th Cir. 2000); *see also Panavision Int'l L.P.*, 141 F.3d at 1322.

Here, Defendants' willful copyright infringement, trademark infringement, and their sale of

products and services that circumvent Plaintiff's security measures were intentionally directed at

Plaintiff, a company headquartered in the forum state, and the harm caused by Defendants was felt

in California. As such, Plaintiff's claims arise out of Defendants' forum-related contacts because

the harm to Plaintiff would not have occurred but for Defendants' actions.

The third and final prong assesses the reasonableness of exercising jurisdiction over the defendant. "Even if the first two requirements are met, in order to satisfy the Due Process Clause, the exercise of personal jurisdiction must be reasonable." *Panavision Int'l L.P.*, 141 F.3d at 1322 (citing *Ziegler v. Indian River County*, 64 F.3d 470, 474-75 (9th Cir. 1995)). For jurisdiction to be reasonable, it must comport with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487 (9th Cir. 1993) (citing *Burger King*, 471 U.S. at 477). Here, there is nothing in the record suggesting that it would be inconvenient or otherwise unfair to require Defendants to defend against this action in California. Thus, this factor supports exercise of personal jurisdiction over Defendants.

In sum, based on the foregoing analysis, the undersigned finds that Plaintiff has sufficiently established that the Court may properly exercise specific jurisdiction over Defendants in this action.

### 3. Service of Process

Next, the court must assess whether Craigslist effected proper service of process on Defendants. In this case, Plaintiff served the original Summons and Complaint on Defendant Gasov, as the agent for Defendant Naturemarket, Inc., on February 27, 2009. (Dkt.#27.) After Plaintiff filed its First Amended Complaint adding Igor Gasov as a named Defendant, Plaintiff served Defendant Gasov with the First Amended Complaint and Summons on April 2, 2009. (Dkt. #25.) Defendants' counsel thereafter contacted Plaintiff regarding service, and the parties agreed that they would treat April 21, 2009, as the date Defendant Gasov was served. (Manheim Decl., Dkt. #37 at ¶3.) Thus, the undersigned finds that Plaintiff properly effected service of process on Defendants in conformance with Federal Rule of Civil Procedure 4(e)(2) and 4(h)(1)(A), (B).

**C.    Application of the *Eitel* Factors to the Case at Bar**

Having found that subject matter jurisdiction exists, that Defendants are subject to personal jurisdiction in California, and that Plaintiff properly effected service of process on Defendants, the Court turns to the *Eitel* factors.

United States District Court
For the Northern District of California

1    1.    Prejudice to Plaintiff

2        Under the first *Eitel* factor the Court must examine whether Plaintiff will be prejudiced if the

3    Court denies default judgment.  782 F.2d at 1471.  Here, denial of Plaintiff's request for judgment

4    and injunctive relief would leave Plaintiff with no means to prevent further infringement by

5    Defendants, and leave Plaintiff prone to continued circumvention of its security measures by

6    Defendants.  Because failure to enter judgment would cause substantial harm to Plaintiff, this factor

7    favors entry of default judgment.

8    2.    Sufficiency of the Complaint and Likelihood of Success on the Merits

9        Under the second and third *Eitel* factors the Court must examine whether the Plaintiff has

10   plead facts sufficient to establish and succeed upon its claims.  *Id.*  The undersigned therefore turns

11   to the ten claims in Plaintiff's Complaint and First Amended Complaint.

12            *a.    Copyright Infringement, 17 U.S.C. § 101, et seq.*

13       Plaintiff's first claim against Defendants is for copyright infringement under the federal

14   Copyright Act, 17 U.S.C. §§ 101 *et seq.*  To prevail on a claim for copyright infringement, Plaintiff

15   must prove: (1) ownership of a valid copyright; and (2) that Defendants copied protected elements of

16   the copyrighted work.  *See Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996) (citation omitted).

17       In its pleadings, Plaintiff sufficiently alleges both components of this claim.  First, Plaintiff

18   has alleged that it owns valid, registered copyrights in its website, including the post to classifieds,

19   account registration, and account log-in features of the website.  (Compl. ¶¶67, 69; FAC ¶¶ 68, 70.)

20   Second, Plaintiff has alleged that Defendants accessed its website and copied it, including creating

21   cached copies, in order to develop, test, implement, use, and provide their AutoPoster Professional

22   software and other auto-posting devices and services. (Compl. ¶¶96, 124-25; FAC ¶¶ 97, 125-26.)

23   Plaintiff has also demonstrated that Defendants continue to access and copy the craigslist website,

24   including creating cached copies, to operate, maintain, and update their auto-posting software

25   programs, devices, and services.  (Compl. ¶96; FAC ¶98.)  Plaintiff asserts that these acts of access

26   and copying were and are unauthorized and exceed the scope of any license granted under the

27   TOUs, and therefore directly infringe on its copyrights in the website.  *See Ticketmaster L.L.C. v.

28   RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1105-06 (C.D. Cal. 2007) (finding that copies of webpages

1    stored automatically in a computer's cache or random access memory (RAM) upon a viewing of the

2    webpage fall within the Copyright Act's definition of copy).  Further, Plaintiff has alleged that

3    Defendants intentionally induced, encouraged, caused, or materially contributed to their customers'

4    infringements of Plaintiff's website by marketing, distributing, updating, and maintaining software

5    and services so that the customers could access and auto-post ads to Plaintiff's website in violation

6    of the limited license granted to them by Plaintiff's TOUs.  (Compl. ¶¶85, 86, 88-90, 93, 94, 96, 99-

7    104; FAC ¶¶86, 87, 89-91, 94, 95, 97, 100-105.)  A defendant is contributorily liable for copyright

8    infringement if the defendant knowingly induces, causes, or materially contributes to the infringing

9    conduct of another.  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

10    Based on these allegations, the undersigned finds that Plaintiff has adequately pled a claim

11    for direct copyright infringement and contributory copyright infringement.  Further, taking these

12    allegations as true, the Plaintiff has demonstrated it is likely to succeed on this claim.

13       *b.*   *Digital Millennium Copyright Act Violation, 17 U.S.C.§ 1201, et seq.*

14    Plaintiff's second claim against Defendants is for violation of the federal Digital Millennium

15    Copyright Act, 17 U.S.C. §§ 1201, *et seq*.  Specifically, Plaintiff contends that Defendants violated §

16    1201(a)(2) and (b)(1) of the DMCA.  "A plaintiff alleging a violation of § 1201(a)(2) must prove:

17    (1) ownership of a valid copyright on a work, (2) effectively controlled by a technological measure,

18    which has been circumvented, (3) that third parties can now access (4) without authorization, in a

19    manner that (5) infringes or facilitates infringing a right protected by the Copyright Act, because of a

20    product that (6) the defendant either (I) designed or produced primarily for circumvention; (ii) made

21    available despite only limited commercial significance other than circumvention; or (iii) marketed

22    for use in circumvention of the controlling technological measure."  *Ticketmaster L.L.C.*, 507 F.

23    Supp. 2d at 1111 (quoting *Chamberlain Group, Inc. v. Skylink Tech., Inc.*, 381 F.3d 1178, 1203

24    (Fed. Cir. 2004)).

25    Similarly, to prevail on its DMCA under §1201(b)(1), Plaintiff must show that Defendants'

26    automated devices circumvented Plaintiff's technological measures protecting its rights in a

27    copyrighted work.  *See* 17 U.S.C. § 1201(b)(2).  As the district court explained in *Ticketmaster*,

28    "Sections 1201(a)(2) and 1201(b)(1) differ only in that 1201(a)(2), by its terms, makes it wrongful to

traffic in devices that circumvent technological measures that *control access to protected works*, while 1201(b)(1) makes it wrongful to traffic in devices that circumvent technological measures that *protect rights of a copyright owner in a work*." *Ticketmaster,* 507 F. Supp. 2d at 1112; *see also Apple, Inc. v. Psystar Corp.*, No. C 08-03251 WHA, 2009 WL 3809798, at *9 (N.D. Cal. Nov. 13, 2009) (noting that § 1201(a)(2) focuses on controlling *access*, while § 1201(b) focuses on protecting a *right* of a copyright owner).

Here, Plaintiff's Complaint and First Amended Complaint sufficiently allege facts going to each of these elements. Plaintiff owns valid copyrights in its website and the content within. (Compl. ¶¶67, 69; FAC ¶¶ 68, 70.) This content is protected by Plaintiff's CAPTCHA software and telephone verification, both of which were circumvented by Defendants. (Compl. ¶¶53, 57, 85; FAC ¶¶ 54, 58, 86.) Plaintiff has alleged that Defendants' AutoPoster Professional software, pre-verified craigslist accounts, and CAPTCHA credits each circumvent these security measures and provide unauthorized access to Plaintiff's copyrighted material. (Compl. ¶¶85-95, 136-37; FAC ¶¶ 86-96, 137–38) Defendants' products and services were designed primarily for the purpose of circumventing Plaintiff's CAPTCHA and telephone verification measures. (Compl. ¶¶49-61, 85, 86, 90-92; FAC ¶¶ 50-62, 86, 87, 91-93.) Defendants thus enabled unauthorized access to and copies of copyright-protected portions of Plaintiff's website controlled by these measures - particularly the ad posting and account creation portions of the website. (Compl. ¶¶85-95, 136; FAC ¶¶ 86-96, 137.) As such, Defendants' manufacture, marketing, and distribution of their software provided third parties unauthorized access to Plaintiff's copyrighted material. (FAC ¶ 138; *see also* Dkt. #44. Weeks Decl. ¶¶ 3(b), Ex. 2; 3(f), Ex. 6.) Taken together, the undersigned finds that Plaintiff has sufficiently stated a claim for violation of Section 1201(a)(2) of the DMCA. Further, because the CAPTCHA Plaintiff employs also protects Plaintiff's rights in its website - a protected work - Plaintiff has also sufficiently stated a claim under Section 1201(b)(1). *See Ticketmaster,* 507 F. Supp. 2d at 1112 (holding that the plaintiff was likely to prevail on claims under both DMCA §1201(a)(2) and (b)(1) based on claim that the defendant's software circumvented a CAPTCHA security measure protecting the website and the works encompassed within it).

      c.      *Computer Fraud and Abuse Act Violation, 18 U.S.C. § 1030*

Plaintiff's third claim is for violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.[2] To state a claim under § 1030(a)(5)(B) and (C), Plaintiff must allege that Defendants intentionally accesses a protected computer without authorization, and as a result of such conduct, caused damage or recklessly caused damage or loss.[3]

Here, Plaintiff adequately pled a claim for violation of the CFAA. First, Plaintiff established that its computers were used in interstate commerce, and therefore qualify as protected computers under the CFAA. (Compl. ¶144; FAC ¶ 145.) Second, Plaintiff alleged that Defendants accessed its computers in violation of the TOUs, and therefore without authorization, for the purpose of employing, implementing and updating their AutoPoster Professional software. (Compl. ¶¶143-50; FAC ¶¶144-51.) Finally, Plaintiff sufficiently pled that the Defendants' actions caused it to incur losses and damages. (Compl. ¶¶114, 115, 148; FAC ¶¶ 115, 116, 149.) Thus, the undersigned finds Plaintiff has sufficiently established its claim under the CFAA.

      d.      *California Penal Code § 502 Violation*

In its fourth claim, Plaintiff alleges that Defendants violated California Penal Code § 502(c)(1), (2), (6), (7), which provide:

> (c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:
>
> (1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property or data.
>
> [. . . .]
>
> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

---

[2]Public Law 110-326, § 204(a)(1), § 1030(a)(5)(A)(ii) and (iii), which Plaintiff cites to in its First Amended Complaint and Proposed Findings of Fact and Conclusions of Law, was amended to eliminate the subsections as well ast the $5,000 damages requirement.

[3]Under the CFAA, a computer used in interstate commerce is defined as a "protected computer." 18 U.S.C. § 1030(e)(2)(B).

1

2

[. . . .]

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

3

4

[. . . .]

5

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

6

7
Cal. Pen. Code §§ 502(c) (1), (2), (6), and (7).

8
Examining Plaintiff's allegations, the undersigned finds that it has sufficiently stated a claim

9
under Section 502(c). With respect to subsection (c)(1), Plaintiff has alleged that Defendants

10
knowingly accessed Plaintiff's computer system in violation of the TOUs and obtained information

11
which they used to develop, update, operate, and maintain their auto-posing software and services.

12
(Compl. ¶¶96, 153; FAC ¶¶ 97, 154.) Under subsection (c)(2), Plaintiff has also alleged that

13
Defendants knowingly accessed Plaintiff's computers and computer system and, without

14
authorization, copied and made use of Plaintiff's data. (Compl. ¶¶96-102; FAC ¶¶ 97-103.) With

15
respect to subsection (c)(6), Plaintiff has also alleged that Defendants knowingly and without

16
permission provided a means of accessing its computers through their use and selling of their auto-

17
posing software, services, and devices. (Compl. ¶¶85, 86, 88, 90-92, 104; FAC ¶¶86, 87, 89, 91-3,

18
105.) These allegations are sufficient to state a claim under subsection (6). Finally, with respect to

19
subsection (7), Plaintiff has alleged that Defendants accessed Plaintiff's computer in an effort to

20
create and implement their auto-posting software. (Compl. ¶¶96, 98, 159; FAC ¶¶ 97, 99, 160.)

21
Taking the allegations in the First Amended Complaint as true, the undersigned finds Plaintiff has

22
stated a claim for violation of Section 502(c).

23
            e.      *Federal Trademark Infringement under 15 U.S.C. § 1114 and § 1125(a)*

24
In its fifth claim, Plaintiff asserts a claim for trademark infringement under § 1114 and §

25
1125(a) of the Lanham Act. To prevail on a trademark infringement claim under § 1114, a plaintiff

26
must show: (1) it owns the trademark at issue; (2) the defendant has used in commerce without

27
authorization, a copy, reproduction, counterfeit or colorable imitation of the plaintiff's mark in

28
connection with the sale, distribution, or advertising of goods and services; and (3) the defendant's

1   use of the mark is likely to cause confusion or to cause mistake or to deceive.  15 U.S.C. § 1141(1).

2   To prevail on a claim under § 1125(a), a plaintiff must show that the defendant's use of its mark is

3   likely to cause confusion, deception or mistake as to "the affiliation, connection, or association of

4   such person with another person, or as to the origin, sponsorship, or approval of his or her goods,

5   services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A).

6           Here, Plaintiff has adequately alleged its ownership of four federal trademark registrations in

7   the "craigslist" mark.  (Compl. ¶72; FAC ¶73.)  Plaintiff has alleged that Defendants, without

8   authorization, have used the "craigslist" mark by displaying the mark in the text and in the headings

9   of sponsored links on internet search engines to advertise their auto-posting products and services.

10  (Compl. ¶¶105-112; FAC ¶¶ 106-113.)  Plaintiff has also shown that Defendants use of the mark

11  causes confusion and mistake and is likely to deceive customers and potential customers regarding

12  the origin, affiliation, association, connection or endorsement of Defendants and their auto-posting

13  products and services.  (Compl. ¶¶108, 110, 112, 118; FAC ¶¶109, 111, 113, 118.); *see Google Inc.*

14  *v. American Blind & Wallpaper*, No. C 03-5340 JF,  2007 WL 1159950, at **6-9 (N.D. Cal. April

15  18, 2007) (finding that sponsored links cause initial customer confusion, allowing the competitor to

16  gain "a customer by appropriating the goodwill that [plaintiff] has developed in its mark." (citing

17  *Playboy Enter., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004)).

18  Thus, the undersigned finds Plaintiff has established its claim for trademark infringement under the

19  Lanham Act.

20          f.      *California Common Law Trademark Infringement*

21          Plaintiff's sixth claim for relief is for trademark infringement under California law.  To

22  prevail on this claim, a plaintiff must show (1) prior use of the mark and (2) the defendant's use of a

23  mark that is likely to cause confusion. *American Petrofina v. Petrofina of California, Inc.*, 596 F.2d

24  896, 897 (9th Cir.1979).  Plaintiff has established prior use of the mark "craigslist."  (Compl. ¶¶73,

25  174; FAC ¶¶ 74, 175.)  Furthermore, as discussed above, Plaintiff has established Defendants' use of

26  the "craigslist" mark in advertising their services and auto posting software and website is likely to

27  cause confusion amongst Plaintiff's users.  (Compl. ¶108; FAC ¶109.)  Thus, the undersigned finds

28  that Plaintiff has sufficiently established its claim for trademark infringement under California

1  common law.  *See Truong Giang Corp. v. Twinstar Tea Corp.*, No. C 06-3594 JSW, 2007 WL

2  1545173, at *4 (N.D. Cal. May 29, 2007) (noting that California trademark infringement standard is

3  substantially similar to federal trademark infringement claim).

4              *g.      Breach of Contract*

5       Plaintiff's seventh claim against Defendants is for breach of contract.  To succeed on a claim

6  for breach of contract under California law, a plaintiff must plead and prove: (1) the existence of a

7  contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and (4)

8  damage to plaintiff resulting therefrom.  *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457,

9  1489 (Cal. 2006).  Plaintiff has sufficiently pled and demonstrated each of these elements.

10      Plaintiff has alleged that the TOUs existed as a valid contract between it and all users,

11 including the Defendants.  (Compl. ¶¶32-36, 43, 47, 177-190; FAC, ¶¶ 33-37, 44, 48, 178-191, Ex.

12 A.)  The TOUs include sections 7(x), which prohibits unauthorized access to computers and

13 disruptive activity; 7(y), which prohibits using any automated device or computer program to enter

14 postings; and 8, which prohibits posting ads as a posting agent.  (Compl. ¶35; FAC ¶36 & Ex. A.)

15 Every time Defendants utilized Plaintiff's services, they assented to the terms of the TOUs by

16 clicking "accept."  (Compl. ¶¶182-85, 210-11; FAC ¶¶ 183-86, 211-12.)  Plaintiff performed by

17 offering and allowing online posting for classified ads.  (Compl. ¶188; FAC ¶ 189.)  Defendants'

18 acts of accessing Plaintiff's website for the purpose of creating and implementing their auto-posting

19 software amounted to a breach of the  TOUs, including the provisions set forth above.  (Compl.

20 ¶187; FAC ¶188.)  As a direct result of Defendants' actions, Plaintiff suffered monetary and other

21 damages.  (Compl. ¶¶112-19, 189-90; FAC ¶¶ 113-120, 190-91.)  Taking these allegations as true,

22 the undersigned finds Plaintiff has established its claim for breach of contract.

23           *h.      Inducing Breach of Contract and Intentional Interference with Contractual
                     Relations*

24

25      Plaintiff's eighth and ninth claims against Defendants are for inducing breach of contract and

26 intentional interference with contractual relations.  To prevail under either of these claims, a plaintiff

27 must demonstrate: (1) a valid contract between the plaintiff and a third party; (2) the defendant's

28 knowledge of this contract; (3) intentional acts designed to induce a breach or disruption of the

contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. *See Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998); *Metal Lite, Inc. v. Brady Constr. Innovations, Inc.*, 558 F. Supp. 2d 1084, 1094 (C.D. Cal. 2007).

Here, Plaintiff has alleged sufficient facts to support each of these elements. First, Plaintiff alleged that when third-party users clicked "accept," they assented to the TOUs and thereby entered into a valid contract with it for the posting of ads on its website. (Compl. ¶¶43, 184-85; FAC ¶¶44, 185-86.) Second, Plaintiff has alleged that Defendants were aware that the third parties had agreed to such terms, (Compl. ¶¶193-94; FAC ¶¶194-95), but nevertheless intended to induce a breach of the TOUs through their sale of, and advertisements for, their auto-posting software, pre-verified craigslist accounts, and CAPTCHA credits. (Compl. ¶102-04, 194; FAC ¶¶103-05,195.) When third parties used Defendants' software, they breached the TOUs, resulting in monetary and other damages to Plaintiff. (Compl ¶195-97; FAC ¶196-98.) Thus, the undersigned finds the Plaintiff has sufficiently established its claims for inducing breach of contract and intentional interference with contractual relations.

### I. Fraud

Plaintiff's final claim is for fraud. "Under California law, the indispensable elements of a fraud claim include (1) a false representation, (2) knowledge of its falsity, (3) intent to defraud, (4) justifiable reliance, and (5) damages." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) (internal quotations and citation omitted). Pursuant to Rule 9 of the Federal Rules of Civil Procedure, a plaintiff must allege a fraud claim with particularity. Fed. R. Civ. P. 9(b); *see also Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

Plaintiff has met the heightened burden under 9(b) and established with particularity the allegations concerning Defendants' fraud. Specifically, Plaintiff has alleged that Defendants represented that they would abide by the TOUs by clicking "accept" when accessing Plaintiff's website. (Compl. ¶¶210-11; FAC ¶¶ 211-12.) Plaintiff has also alleged that Defendants knew they would not abide by the TOUs. (Compl. ¶214; FAC ¶215.) Plaintiff further alleges that Defendants' intent in accessing the website was for the purpose of updating and implementing auto-posting software in violation of the TOUs. (Compl. ¶¶96-99; FAC ¶¶97-100.) Plaintiff also alleged that it

1  reasonably relied on Defendants' agreeing to the terms of the TOUs when they clicked "accept," and

2  based on Defendants' representation, it granted Defendants access to its website. (Compl. ¶212; FAC

3  ¶213.) Through their false representation, Defendants obtained information about the structure and

4  operating features of Plaintiff's website and services, enabling them to design, test, and operate their

5  auto-posting software, services, and related devices, which, in turn, injured Plaintiff. (Compl. ¶216-

6  17; FAC ¶¶217-18.) Based on the these allegations, the undersigned finds the Plaintiff has

7  sufficiently stated a claim for fraud.

8        3.    <u>Sum of Money at Stake</u>

9        The fourth *Eitel* factor examines the amount of money at stake in relation to the seriousness of

10  a defendant's conduct. *Eitel*, 782 F.2d at 1471. As discussed in greater detail below, Plaintiff seeks

11  damages in the range of $1,177,827.07 to $4,900,327.07. Where a defendant has engaged in willful

12  infringement and has refused to respond to the allegations brought against it, damages of this

13  magnitude have been deemed appropriate. *See Philip Morris U.S.A. Inc. v. Castworld Prods.*, 219

14  F.R.D. 494, 500 (C.D. Cal. 2003) (finding that the defendant's willful trademark infringement

15  through large scale sale of counterfeit cigarettes and its failure to participate in the judicial process

16  justified statutory damages under the Lanham Act in the amount of $2,000,000). Here, Defendants

17  have engaged in willful copyright and trademark violations, and thus far have failed to participate in

18  the litigation process. Accordingly, the undersigned finds this factor favors entry of default

19  judgment.

20        4.    <u>Possibility of Dispute Concerning Material Facts</u>

21        The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the

22  material facts surrounding the case. *Eitel*, 782 F.2d at 1471-72. Here, Plaintiff has set forth adequate

23  allegations detailing Defendants' development, sale, and use of auto-posting software and various

24  other devices to circumvent Plaintiff's security measures. It is unlikely that, even if Defendants

25  appeared in this matter, they would be able to dispute these facts. Therefore, this factor weighs in

26  favor of entry of default judgment.

27

28

5.    Possibility of Excusable Neglect

The sixth *Eitel* factor examines whether Defendants' failure to respond to Plaintiff's allegations was the result of excusable neglect. *Id*. at 1472. As discussed above, both Defendants were properly served with process. (Dkts. #16, 25.) Additionally, counsel for Defendant Gasov contacted the Court regarding his potential appearance and representation of Defendant Gasov in this matter, but failed to subsequently take any action or otherwise appear. (Dkt. #26.) Thus, Plaintiff has proffered evidence showing Defendants were clearly aware of the pending litigation. Consequently, it is unlikely Defendants' failure to appear and litigate this matter was based on excusable neglect. Therefore, this factor favors entry of default judgment.

6.    Policy for Deciding on the Merits

The final *Eitel* factor examines whether the strong policy favoring deciding cases on the merits prevents a court from entering default judgment. *Eitel*, 782 F.2d at 1472. Generally, default judgments are disfavored, and a case should be decided on the merits whenever possible. *See Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). However, where a defendant's failure to appear "makes a decision on the merits impracticable, if not impossible," entry of default judgment is warranted. *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). As Defendants have failed to appear or respond in this matter a decision on the merits is impossible. Therefore, this factor favors entry of default judgment.

7.    Summary of *Eitel* Factors

In sum, reviewing Plaintiff's Motion in light of the factors articulated in *Eitel* militates in favor of granting default judgement against Defendants. The undersigned therefore turns to Plaintiff's requested damages and injunctive relief.

**D.    Remedies**

Having determined that default judgment should be granted, the undersigned must next evaluate Plaintiff's requests for relief, including the appropriate amount of damages to award. *See 3A Entm't Ltd. v. Constant Entm't, Inc.*, No C 08-1274 JW, 2009 WL 248261, at *6 (N.D. Cal. Jan. 30, 2009). In its First Amended Complaint, Plaintiff requests that the Court issue a permanent injunction

1    against Defendants and award it monetary damages and its attorneys' fees and costs.  The

2    undersigned will evaluate each of Plaintiff's requests in turn.

3          1.      Injunctive Relief

4          Plaintiff urges the Court to enter a permanent injunction against Defendants as proposed in

5    Section 1 of its Prayer for Relief in its First Amended Complaint.  Plaintiff contends that a permanent

6    injunction is necessary to stop Defendants from their continued violation of its TOUs and to protect

7    its copyrights and trademarks.

8          As set forth in detail above, Plaintiff has shown that it entitled to judgment on each of its

9    claims, including its claims for federal copyright infringement, violation of the DMCA, violation of

10   the CFAA, and federal trademark infringement under the Lanham Act.  Each of these statutes

11   authorizes the Court to grant injunctive relief.  *See* 17 U.S.C. §502(a) (authorizing a court to grant

12   injunctions "as it may deem reasonable to prevent or restrain infringement of a copyright"); 17 U.S.C.

13   §1203(b)(1) (authorizing courts to issue permanent injunctions in actions brought under §1201 "on

14   such terms as [they] deem[] reasonable to prevent or restrain a violation"); 18 U.S.C. §1030(g)

15   (authorizing injunctive relief for violations of the CFAA); 15 U.S.C. §1116(a) (authorizing

16   injunctions to prevent trademark violations).  Based on the allegations and evidence Plaintiff has

17   presented, the undersigned finds that Plaintiff has shown that it is entitled to a permanent injunction

18   against Defendants.  Thus, the Court must determine the proper scope of such injunction.

19         Generally, an injunction must be narrowly tailored to remedy only the specific harms shown

20   by a plaintiff, rather than to enjoin all possible breaches of the law.  *See Price v. City of Stockton*, 390

21   F.3d 1105, 1117 (9th Cir. 2004); *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 9982 (N.D. Cal. 2006).

22   The undersigned has reviewed the language Plaintiff proposes be included in the injunction and, with

23   the exception of paragraph (c), is satisfied that it is not over-broad as it merely enjoins Defendants

24   from engaging in the offending conduct previously described in this Order.  As to paragraph (c), the

25   undersigned finds it to be vague and not directed specifically at the Defendants' infringing conduct,

26   but rather, a general proscription against Defendants engaging in any conduct that negatively affects

27   Plaintiff's business or services.  The undersigned therefore **RECOMMENDS** that the Court issue a

28

1   permanent injunction consistent with the language set forth in ¶1 of Plaintiff's Prayer for Relief, with

2   the exception of paragraph (c).

3       2.   <u>Monetary Damages</u>

4       Plaintiff also seeks an award of monetary damages.  Compensatory damages are available to

5   Plaintiff under each of its claims.  *See* 17 U.S.C. §504; 17 U.S.C. § 1203(c); 18 U.S.C. § 1030(g);

6   Cal. Pen. Code § 502(e); 15 U.S.C. § 1117(a); Cal. Civ. Code § 3300; Cal. Civ. Code § 1709.  With

7   respect to Plaintiff's claim against Defendants under the DMCA, Plaintiff may elect statutory

8   damages as an alternative to actual damages and Defendants' profits.  17 U.S.C. § 1203(c)(3).

9   Moreover, under California law, Plaintiff may seek liquidated damages for its breach of contract

10  claim.  Cal. Civ. Code § 1671.  Additionally, pursuant to Plaintiff's California Penal Code section

11  502, inducing breach of contract, intentional interference with contractual relations, and fraud claims,

12  Plaintiff may seek punitive or exemplary damages because Defendants' conduct was undertaken with

13  the intent to injure Plaintiff and with willful and conscious disregard for Plaintiff's rights, such that it

14  constitutes clear and convincing evidence of oppression, fraud, and malice.  *See* Compl. ¶¶ 132, 142,

15  163, 199, 207, 219; FAC ¶¶ 133, 143, 164, 200, 208, 220; Cal. Pen. Code ¶ 502(e)(4); Cal. Civ. Code

16  ¶ 3294.

17      As Plaintiff explains in its Motion, because Defendants have failed to appear and respond to

18  Plaintiff's Complaint and First Amended Complaint, it has been unable to pursue discovery from

19  Defendants, thereby prejudicing its ability to establish its actual damages.  (Mot. at 20.)  As a result,

20  Plaintiff requests that the Court award: (1) statutory damages for Defendants' violations of the

21  DMCA; (2) Plaintiff's actual damages for breach of contract under the liquidated damages provisions

22  of its TOUs; and (3) punitive or exemplary damages under California law in an amount sufficient to

23  deter Defendants from future misconduct.  (Mot. at 20.)

24          a.   *Award of DMCA Statutory Damages*

25      Under the DMCA, a successful plaintiff may elect to recover an award of statutory damages

26  in lieu of actual damages.  *See* 17 U.S.C. § 1203(c)(3)(A); *Sony Computer Entm't Am., Inc. v.*

27  *Divineo, Inc.*, 457 F. Supp. 2d 957, 966 (N.D. Cal. 2006).  Pursuant to 17 U.S.C. §1203(c)(3)(A),

28          At any time before final judgment is entered, a complaining party may
            elect to recover an award of statutory damages for each violation of

> section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

The Ninth Circuit has recognized that courts have wide discretion in determining the appropriate level of statutory damages within this range. *See Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990). In this case, Plaintiff seeks an award of statutory damages using the maximum ($2,500) multiplier. (Mot. at 21.) It argues that use of maximum multiplier is warranted by Defendants' deliberate, flagrant, and callous disregard of its rights, and because Defendants have ignored this lawsuit and prevented Plaintiff from conducting discovery to properly prosecute its case and prove its damages. (Mot. at 21.) Having carefully considered Plaintiff's argument, the undersigned is not persuaded that application of the $2,500 multiplier is appropriate in this action.

In support of its argument, Plaintiff cites to *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068 (N.D. Cal. 2005). In that case, the plaintiff had sent a cease-and-desist letter to the defendant, and the defendant subsequently signed an agreement to cease any infringing activities. *Id.* at 1071. However, the defendant continued his infringement and the court found that he never intended to abide by the agreement. *Id.* at 1072. The defendant also signed a stipulated consent judgment in which he stipulated that he had violated the DMCA. *Id.* The court also noted that the defendant intentionally deleted thousands of files from his hard drive, including documents that might have allowed it to determine the actual level of his sales. *Id.* at 1075. In awarding damages, the court used a two-tiered system - $800 per device for any violations prior to the time defendant signed the agreement, and $2,500 per device after the agreement. *Id.*

Here, Plaintiff has demonstrated that Defendants' conduct was willful and intentional, and that Defendants' failure to appear in this matter has hindered Plaintiff's ability to take discovery on damages. However, Plaintiff has not shown that Defendants' behavior rises to the level of the defendant in *Sony*, where the defendant willingly violated a signed agreement to discontinue infringement, with no intention to ever abide by the agreement, and he intentionally deleted thousands of files. At the same time, the Court recognizes that Defendants' actions were knowing and intentional. Thus, using a multiplier in the middle range is appropriate and the undersigned finds that $1,000 per offending act or device is reasonable in this circumstance.

1    Plaintiff requests that the Court apply the statutory damages amount for each "device" in

2    which Defendants trafficked or for each "offer" of a device that Defendants made.  (Mot. at 21.)  As

3    previously described, Defendants advertised and sold "CraigsList AutoPoster Professional," which

4    Defendants indicated includes an "Automatic CAPTCHA bypass" feature allowing Defendants and

5    its customers to circumvent Plaintiff's CAPTCHA security measure.  (Compl. ¶86; FAC ¶87; Weeks

6    Decl. ¶3(b) & Ex. 2.)  Plaintiff states that in informal discussions, Defendants stated that they grossed

7    roughly $40,000 from their powerpostings.com website.  (Manheim Decl. ¶6.)  Thus, Plaintiff

8    proffers that, assuming Defendants sold only "CraigsList AutoPoster Professional" at its advertised

9    price of $84.95, Defendants sold approximately 470 units of "CraigsList AutoPoster Professional,"

10   with its CAPTCHA circumvention feature.  Plaintiff therefore asserts that it is entitled to statutory

11   damages for each of the CraigsList AutoPoster Professional device sold under the DMCA.

12       The undersigned has considered Plaintiff's request and methodology and finds it to be

13   reasonable.  Accordingly, applying the $1,000 statutory damage multiplier to each of the 470 devices

14   sold, the undersigned recommends that the Court award Plaintiff $470,000 for Defendants' DMCA

15   violations.

16           *b.*     *Award of Actual Damages*

17       Plaintiff also seeks an award of actual damages for breach of contract pursuant to the

18   liquidated damages provisions in its TOUS.  Specifically, the TOUS provide in relevant part: "If you

19   post Content in violation of the TOU . . . you agree to pay craigslist one hundred dollars ($100) for

20   each item of Content posted."  (FAC, Ex. A ¶19(d).)  Further, the TOUs provide that "[i]f you are a

21   Posting Agent that uses the Service [*i.e.*, the craigslist website] in violation of the TOU, in addition to

22   any liquidated damages under clause (d), you agree to pay craigslist one hundred dollars ($100) for

23   each and every Item you post in violation of the TOU."  (FAC, Ex. A ¶19(e).)  As discussed in detail

24   above, Plaintiff has demonstrated that Defendants acted as a "Posting Agent" by posting ads for their

25   customers on Plaintiff's website, thereby violating paragraph 8 of the TOUs.  (Compl. ¶93; FAC

26   ¶94.)  Thus, Plaintiff asserts that, pursuant to the liquidated damages clause of the TOUs - which

27   Defendants assented to - it is entitled to $200 for every ad Defendants posted as posting agents.

28

With respect to the number of ads Defendants posted, Plaintiff contends that on their website Defendants advertised and offered to post customers' ads at a rate of 25 ads per day for a week - for a total package of 175 illegal ads per week. (Compl. ¶95; FAC ¶96; Weeks Decl. ¶3(c) & Ex. 3.) Plaintiff further contends that Defendants advertised that they developed, sold, and updated their products and services for two years. (Weeks Decl. ¶3(b) & Ex.2.) Thus, Plaintiff advances that, assuming Defendants sold at least one such package per week for the two years they were in business, and sold no other posting agent packages, Defendants posted at least 18,200 ads as a posting agent for a total liquidated damages amount of $3,640,000. Alternatively, Plaintiff contends that, even assuming that Defendants only sold one such package a month for two years, and no other posting agent packages advertised on their website, Defendants posted 4,200 ads as a posting agent for a total liquidated damages amount of $840,000.[4]

The undersigned has carefully considered Plaintiff's argument and supporting methodology for calculating liquidated damages under the TOUs. The undersigned finds that Plaintiff has sufficiently demonstrated that it is entitled to an award of liquidated damages for Defendants' violations of the TOUs. With respect to calculating the appropriate amount of liquidated damages, the undersigned finds that, taking into account that Plaintiff has been prevented from taking discovery from Defendants, Plaintiff's have adequately demonstrated that they are entitled to at least $840,000 in liquidated damages. The undersigned therefore recommends that the Court award Plaintiff this amount.

### c. Punitive Damages

Finally, Plaintiff contends that, "[i]n light of Defendants' knowing, deliberate, intentional, willful, and conscious disregard for craigslist's rights," an award of punitive or exemplary damages is appropriate to deter Defendants from future misconduct. (Mot. at 23.) In support, Plaintiff asserts that, "Defendants are like many other individuals and companies profiting from craigslist's goodwill and popular services. An appropriate punitive or exemplary damage award is necessary to stop and deter Defendants from future misconduct and to stop and deter other from the same misconduct."

---

[4] Plaintiff points out that the total income under either of these assumed sales figures is less than the $40,000 gross income that Defendants indicated they made from powerpostings.com. (*See* Dkt. #43 at 23 n.8.)

1  (*Id.*) The undersigned has carefully considered Plaintiff's request. Although the Court is authorized

2  to award punitive damages under both federal and state law, the undersigned in unpersuaded that

3  punitive damages are necessary in this case to deter Defendants from committing future violations.

4  In particular, Plaintiff is entitled to significant statutory and liquidated damages and is also entitled to

5  injunctive relief. Such awards are sufficient to deter future misconduct by Defendants.

6          3.    <u>Attorneys' Fees and Costs</u>

7       Plaintiff also requests that the Court award attorneys' fees and costs. Plaintiff seeks

8  $83,614.45 in fees and $1,712.07 in costs.[5] The DMCA authorizes a court, "in its discretion," to

9  award costs and reasonable attorneys fees to the prevailing party. 17 U.S.C. § 1203(b)(4), (5); *Sony*

10 *Computer Entm't Am., Inc.*, 457 F. Supp. 2d at 967. Attorneys fees are also authorized pursuant to

11 California Penal Code section 502(e)(2). Additionally, the Lanham Act provides that, "[t]he court in

12 exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).

13 The Ninth Circuit has recognized that, "[w]hile the term 'exceptional' is not defined in the statute,

14 attorneys' fees are available in infringement cases where the acts of infringement can be

15 characterized as malicious, fraudulent, deliberate, or willful." *Rio Properties, Inc. v. Rio Int'l,*

16 *Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002) (citing *Playboy Enters., Inc. v. Baccarat Clothing Co.*,

17 692 F.2d 1272, 1276 (9th Cir. 1982)).

18      In support of its request for an award of fees, Plaintiff contends that it had no option but to

19 pursue this action and Defendants' default in order to stop their unauthorized and unlawful activities.

20 (Mot. at 24.) Further, Plaintiff has alleged that Defendants' infringement of Plaintiff's mark was

21 deliberate, willful, and fraudulent, *see* FAC ¶¶103, 105, 112, 130, 147, 148, 171, 188, 194-195, 204,

22 216, which the undersigned takes as true for purposes of this Motion. Thus, Plaintiff has prevailed on

23 its DMCA and Lanham Act claims and has demonstrated that, given the willful, deliberate, and

24 fraudulent nature of Defendants' conduct, this is an "exceptional" case for purposes of 15 U.S.C. §

25 1117(a). The undersigned therefore recommends that the Court award attorneys' fees and costs as

26 detailed below.

27

28      [5] Plaintiff originally sought $83,615.00 in fees. However, in supplemental briefing, it stated that a calculation error had been made, and the correct total is $83,614.45. (McDougall Supp. Decl., Dkt. #53.)

1    To determine a reasonable attorney fee award, courts employ the lodestar method.

2 *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1214-15 (9th Cir. 2003).  Under the

3 lodestar method, a court must multiply the number of hours reasonably expended on the litigation by

4 the reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Once calculated, the

5 lodestar rate may be adjusted to account for other factors, including the customary fee, nature and

6 length of the professional relationship between client and attorney, and the awards allowed in similar

7 cases.  *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.9 (9th Cir. 1996).

8         a.    *Hourly rates*

9    In determining a reasonable attorneys' fee award, the Court must find an objective source for

10 setting counsel's hourly rates and determine whether the hours expended by counsel are concordant

11 with the requirements of the litigation at hand.  Plaintiff submitted a detailed itemization of its

12 attorneys' fees and costs, as summarized in the Declaration of Elizabeth McDougall.  (McDougall

13 Decl., Dkt. #45.)  McDougall attests that two partners, three associates, and one paralegal from the

14 firm of Perkins Coie LLP ("Perkins") were the principals working on this matter.

15    Elizabeth McDougall has been a practicing attorney since 1993 and is a seventh year partner

16 at Perkins.  She is the lead attorney in this matter.  Her practice has focused on commercial litigation

17 with a substantial portion devoted to intellectual property and internet related issues.  Her billing rate

18 was $525 /hr. in 2008, $550 /hr. in January-March 2009, and $549 /hr. in April-June 2009.  (Dkt. #45,

19 ¶ 22.)

20    James McCullagh has been a practicing attorney since 1999 and is a fourth year partner at

21 Perkins.  His area of practice is commercial litigation with a substantial portion of his practice

22 devoted to intellectual property and internet related issues.  His billing rate was $485 /hr. in 2008,

23 $500 /hr. in January-March 2009, and $499.50 /hr. in April-June 2009.  (Dkt. #45, ¶ 23.)

24    Brian Hennessy has been an attorney since 2003 and is a fifth year associate at Perkins.  Mr.

25 Hennessy's area of practice is commercial litigation with a substantial portion of his practice devoted

26 to intellectual property issues.  His billing rate was $395 /hr. in 2008, $425 .hr. in January-March

27 2009, and $423 /hr. in April-June 2009.  (Dkt. #45, ¶ 24.)

28

1   Nicholas Manheim is a second year associate at Perkins.  His area of practice is commercial

2   litigation with a substantial portion of his practice devoted to intellectual property issues.  His billing

3   rate was $265 /hr. in 2008, $300 /hr. in January-March 2009, and $301.50 /hr. in April-June 2009.

4   (Dkt. #45, ¶ 25.)

5   Liling Poh is a first year associate at Perkins.  Her area of practice is commercial litigation

6   with a substantial portion of her practice devoted to intellectual property issues.  her billing rate was

7   $310 /hr. in 2008, $320 /hr. in January-March 2009, and $319.50 /hr. in April-June 2009.  (Dkt. #45,

8   ¶ 26.)

9   David Weeks has been a paralegal since 2000.  His billing rate was $230 /hr. in 2008, $240

10  /hr. in January-March 2009, and $238.40 /hr. in April-June 2009.  (Dkt. #45, ¶ 27.)

11  Plaintiff seeks $83,614.45 in attorneys' fees.  A summary of this amount is as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| Elizabeth McDougall: | 7.3 hours | x | $549.00 | = | $4,007.70 | |
| | | | TOTAL | = | **$4,007.70** | |
| James McCullagh: | 4.1 hours | x | $485.00 | = | $1,988.50 | |
| | 19.7 hours | x | $500.00 | = | $9,850.00 | |
| | 13.9 hours | x | $499.50 | = | $6,943.05 | |
| | | | TOTAL | = | **$18,781.55** | |
| Brian Hennessy: | 4.1 hours | x | $395.00 | = | $1,691.50 | |
| | 3.3 hours | x | $425.00 | = | $1,402.50 | |
| | 5.9 hours | x | $423.00 | = | $2,495.70 | |
| | | | TOTAL | = | **$5,517.70** | |
| Nicholas Manheim: | 15.1 hours | x | $265.00 | = | $4,001.50 | |
| | 19.9 hours | x | $300.00 | = | $5,970.00 | |
| | 45.6 hours | x | $301.50 | = | $20,411.55 | |
| | | | TOTAL | = | **$30,383.05** | |
| Liling Poh: | 8.4 hours | x | $310.00 | = | $2,604.00 | |
| | 36.2 hours | x | $320.00 | = | $11,584.00 | |
| | 9.5 hours | x | $319.50 | = | $3,035.25 | |
| | | | TOTAL | = | **$17,223.25** | |
| David Weeks: | 4.2 hours | x | $230.00 | = | $966.00 | |
| | 22.6 hours | x | $240.00 | = | $5,424.00 | |
| | 5.5 hours | x | $238.40 | = | $1,311.20 | |
| | | | TOTAL | = | **$7,701.20** | |
| | | | **TOTAL FEES:** | | **$83,614.45** | |

27  A widely recognized compilation of attorney and paralegal rate data is the Laffey matrix, so

28  named because of the case that generated the index.  In *Laffey v. Northwest Airlines, Inc.,* 572 F.

Supp. 354 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir.1984), the court employed a variety of hourly billing rates to account for the various attorneys' different levels of experience. The Laffey matrix has been regularly prepared and updated by the Civil Division of the United States Attorney's Office for the District of Columbia and used in fee shifting cases, among others. *See* http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html, visited January 19, 2010. The Laffey matrix is especially useful when the work to be evaluated was performed by a mix of senior, junior and mid-level attorneys, as well as paralegals, as is the case in this action.

Under the 2008-2009 Laffey matrix[6], attorneys bill at the following rates according to experience:

| Experience | Rate Per Hour |
| --- | --- |
| 20+ Years | $464 |
| 11-19 Years | $410 |
| 8-10 Years | $330 |
| 4-7 Years | $270 |
| 1-3 Years | $225 |
| Paralegals | $130 |

These figures are, however, tailored for the District of Columbia, which has a different cost of living than San Francisco. Accordingly, some adjustment appears appropriate here. To make the adjustment, the Court will use the federal locality pay differentials based on federally compiled cost of living data. *See* U.S. Office of Personnel Mgmnt., 2009 General Schedule of Locality Pay, available at http://www.opm.gov/oca/09tables/indexGS.asp (last visited 1/27/2010); *In re HPL,* 366 F. Supp. 2d 912, 921 (N.D. Cal. 2005) (Walker, J) (adjusting locality pay differentials based on the geographical region in which lead counsel's firm operated). A review of the pay tables shows the Washington-Baltimore area has a +23.10 percent locality pay differential, while the San Francisco

---

[6] According to the United States Attorney's Office website, available at http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html, there was no change in the *Laffey* rates between 2008-2009 and 2009-2010.

area ("SF") has a +34.35 percent locality pay differential. Adjusting the Laffey matrix figures accordingly will yield appropriate rate for San Francisco: +11.25.

Applying these adjustments, the Court obtains the following rates (rounded to the nearest dollar):

| Experience | Rate Per Hour |
|---|---|
| 20+ Years | $516 |
| 11-19 Years | $456 |
| 8-10 Years | $367 |
| 4-7 Years | $300 |
| 1-3 Years | $250 |
| Paralegals | $145 |

Based on these rates, it is apparent that the rates charged by Perkins, as listed above, are somewhat higher than the rates under the Laffey matrix. In her declaration, Elizabeth McDougall states that the hourly fees charged to Plaintiff are less than those that would routinely be charged by similarly situated attorneys. (Dkt. #45, ¶ 31.) Aside from this statement from its counsel, however, Plaintiff presents no evidence that the attorneys' fees requested here are a conservative estimate of the fees that it is entitled to receive. Thus, the Court is inclined to accept the hourly rates under the Laffey matrix. The following table reflects the Court's adjusted lodestar calculations for attorneys and paralegals working on the case.

| Attorney/Paralegal | Years Experience | 2008-2009 Laffey Rate | Total Hours | Total Lodestar (Based on Laffey Rate) |
|---|---|---|---|---|
| Elizabeth McDougall | 15-16 | $456 | 7.3 | $3,328.80 |
| James McCullagh | 9-10 | $367 | 37.7 | $13,835.90 |
| Brian Hennessy | 5-6 | $300 | 13.3 | $3,990.00 |
| Nicholas Manheim | 1-2 | $250 | 102.7 | $25,675.00 |
| Liling Poh | 1 | $250 | 54.1 | $13,525.00 |
| David Weeks | Paralegal | $145 | 32.3 | $4,683.50 |

Based on the above calculations, the total reward under the Laffey matrix is $65,038.20. However, the Court must also consider whether the number of hours is reasonable.

### b.  Number of hours

The Court next evaluates whether the number of hours expended by Perkins is appropriate to the requirements of the particular case.  Reasonably competent counsel bill a reasonable number of hours; they do not bill hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434.  Thus, if the requested number of hours is greater than the number of hours reasonably competent counsel would have billed, then the Court should reduce the requested number of hours accordingly.  *Id.*  Additionally, the Court must take into consideration discounts commonly given to clients.  As emphasized by the Supreme Court in *Hensley*, "Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."  *Id.*

In support of the amount of its fees request, Perkins provides the following declaration from Elizabeth McDougall:

> This case focused on the ever-changing technologies and security measures employed on the internet, and developing successful strategies for approaching these novel concepts requires unusual effort and skill.  Though the novel issues in this case required substantial research and examination, we did not include any of the fees incurred prior to the filing of the complaint or fees for work that was not easily separated as applying solely to this case.  Therefore, the attorneys' fees and expenses requested here are a conservative estimate of the fees that craigslist is entitled to receive.

(McDougall Decl., Dkt. #45, ¶ 31.)

Upon review of Plaintiff's submissions, the Court finds that the number of hours expended by counsel is appropriate to the requirements of this case.  Accordingly, the undersigned recommends the District Court award Plaintiff its attorneys' fees in the amount of $65,038.20.

### c.  Costs

Finally, Plaintiff seeks costs in the amount of $1,712.07.  These costs include messenger and service costs of $1,152.07, pro hac vice costs of $210.00, and a filing fee of $350.00.  (McDougall Decl., Dkt. #45, ¶ 30.)  Plaintiff has provided itemized billing statements for these costs, (McDougall Supp. Decl., Dkt. #53, Ex. H), which the Court finds reasonable.  Accordingly, the undersigned recommends the District Court award Plaintiff its costs in the amount of $1,712.07.

# IV. CONCLUSION

Based on the above analysis, the undersigned **RECOMMENDS** that the District Court **GRANT IN PART** and **DENY IN PART** Plaintiff craigslist's Motion for Default Judgment (Dkt. #36) as follows:

The undersigned **RECOMMENDS** that the Court **GRANT** craigslist's request for default judgment as to all of its claims in its First Amendment Complaint against Defendants. The undersigned **RECOMMENDS** that the Court **GRANT** craigslist's request for a permanent injunction against Defendants consistent with the following language.[7]

Defendants Igor Gasov and Naturemarket, Inc., their employees, representatives, agents and all persons or entities acting in concert with them are preliminarily and permanently enjoined from:

    (a)    manufacturing, developing, creating, adapting, modifying, exchanging, offering, distributing, selling, providing, importing, trafficking in, or using any automated device or computer program (including but not limited to, any technology, product, service, device, component, or part thereof) that enables postings on craigslist without each posting being entered manually;

    (b)    manufacturing, developing, creating, adapting, modifying, exchanging, offering, distributing, selling, providing, importing, making available, trafficking in, or using content that uses automated means (including, but not limited to, spiders, robots, crawlers, data mining tools, and data scraping tools) to download or otherwise obtain data from craigslist;

    (c)    copying, distributing, displaying, creating derivative works or otherwise using protected elements of craigslist's copyrighted website (located at www.craigslist.org), including but not limited to, the website's post to classifieds, account registration and account log in expressions and compilations, and from inducing, encouraging, causing or materially contributing to any other person or entity doing the same;

---

[7]Plaintiff's proposed paragraph (c) has been deleted and the subsequent paragraphs renamed accordingly.

(d)     circumventing technological measures that control access to craigslist's copyrighted website and/or portions thereof (including, but not limited to, CAPTCHAs and RECAPTCHAs), and from inducing, encouraging, causing or materially contributing to any other person or entity doing the same;

(e)     manufacturing, developing, creating, adapting, modifying, exchanging, offering, selling, distributing, providing, importing, trafficking in, or using technology, products, services, devices, components, or parts thereof, that are primarily designed or produced for the purpose of circumventing technological measures and/or protection afforded by technological measures that control access to craigslist's copyrighted website and/or portions thereof, and from inducing, encouraging, causing or materially contributing to any other person or entity doing the same;

(f)     accessing or attempting to access craigslist's computers, computer systems, computer network, computer programs, and data, without authorization or in excess of authorized access, including, but not limited to, creating accounts or posting content on the craigslist website, and from inducing, encouraging, causing, materially contributing to, aiding or abetting any other person or entity to do the same;

(g)     manufacturing developing, creating, adapting, modifying, exchanging, offering, selling, distributing, providing, importing, trafficking in, purchasing, acquiring, transferring, marketing or using any program, device, or service designed to provide an automated means of accessing craigslist's website, automated means of creating craigslist accounts, or automated means of posting ads or other content on the craigslist's website, including, but not limited to, any program, device, or service that is, in whole or in part, designed to circumvent security measures on the craigslist website;

(h)     repeatedly posting the same or similar content on craigslist, posting the same item or service in more than one category on craigslist, posting the same item or service in more than one geographic area on craigslist, and from inducing, encouraging, causing, assisting, aiding, abetting or contributing to any other person or entity doing the same;

1     (I)     posting ads on behalf of others, causing ads to be posted on behalf of others, and

2               accessing craigslist to facilitate posting ads on behalf of others;

3     (j)     using, offering, selling or otherwise providing a third-party agent, service, or

4               intermediary to post content to craigslist;

5     (k)     misusing or abusing craigslist, the craigslist website and craigslist services in any way,

6               including, but not limited to, violating craigslist TOU;

7     (l)     accessing or using craigslist's website for any commercial purpose whatsoever, and;

8     (m)     using the CRAIGSLIST mark and any confusingly similar designation in Internet

9               advertisements and otherwise in commerce in any manner likely to confuse consumers

10               as to their association, affiliation, endorsement or sponsorship with or by craigslist

11     The undersigned further **RECOMMENDS** that the Court award Plaintiff craigslist $470,000

12 in statutory damages under the DMCA and $840,000 in liquidated damages under the TOUs, but

13 **DENY** Craigslist's request for punitive damages.

14     The undersigned further **RECOMMENDS** that the Court grant Plaintiff craigslist's request

15 for attorneys' fees in the amount of $$65,038.20 and costs in the amount of $1,712.07.

16     Pursuant to Fed. R. Civ. P. 72(b)(2) a party may serve and file objections to this Report and

17 Recommendation fourteen (14) days after being served.

18     **IT IS SO RECOMMENDED.**

19

20 Dated: January 28, 2010                          _____

21                                MARIA-ELENA JAMES
                                    United States Magistrate Judge

22

23

24

25

26

27

28